UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -
MICHAEL PSENICSKA,



Plaintiff,

**COMPLAINT**

-against-

**JURY TRIAL DEMANDED**

TWENTIETH CENTURY FOX FILM CORPORATION,
ONE AMERICA PRODUCTIONS, INC.,
TODD LEWIS, and
SACHA BARON COHEN,



RECEIVED
DEC 0 3 2007
U.S.D.C. S.D.N.Y.
CASHIERS

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff, Michael Psenicska, by his attorneys, Peter M. Levine and D. Krausz and Associates, for his Complaint, states:

### INTRODUCTION

1. This diversity action arises from defendants' illegal and unauthorized use of plaintiff's likeness in the film *BORAT- Cultural Learnings of America for Make Benefit Glorious Nation of Kazahkstan*. Each of the defendants was responsible for and participated in the filming, production, or distribution of the Borat film. Plaintiff was fraudulently induced to appear in the Borat film, and plaintiff's likeness and persona have been used extensively to promote and advertise both the theatrical and DVD releases of the film in violation of sections 50 and 51 of the New York Civil Rights Law and in violation of the common law of the State of New York. Defendants have attempted to shield their reprehensible conduct with a document they call a "Standard Consent Agreement," which they fraudulently induced plaintiff to sign. The document should be declared void, and defendants should be found liable for actual and punitive damages.

## THE PARTIES

2. Plaintiff is a citizen of the State of Maryland.

3. On information and belief, defendant Twentieth Century Fox Film Corporation is a Delaware corporation with a principal place of business at 10201 West Pico Boulevard, Los Angeles, CA 90035.

4. On information and belief, defendant One America Productions, Inc. is a California corporation with its principal place of business in Los Angeles County, California.

5. On information and belief, defendant Todd Lewis is a citizen of the State of California with a place of business in Los Angles County, California.

6. On information and belief, defendant Sacha Baron Cohen is a citizen of United Kingdom and a resident of the State of California.

## JURISDICTION AND VENUE

7. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because this action is between citizens of different States or between a citizen of a State and citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8. This court has jurisdiction over the person of each defendant by virtue of section 301 of the New York Civil Practice Law & Rules, because, upon information and belief, each defendant is present, or has been present for relevant periods of time, in the State of New York.

9. This court has jurisdiction over the person of each defendant by virtue of section 302 of the New York Civil Practice Law & Rules, because, upon information and belief, each defendant (a)    transacted business in the State of New York, and plaintiffs' claims arose out of that transaction of business; or (b) committed tortious acts within the State of New York, and plaintiffs' claims arose out of those tortious acts.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), because either (a) a substantial part of the events or omissions giving rise to the claims occurred in this District or (b) at least one defendant is subject to personal jurisdiction in this District, and there is no district in which the action may otherwise be brought.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b), because the Standard Consent Agreement provides that any claim in connection with the Borat film be "brought before and adjudicated by only a competent court located in the State of New York and County of New York."

## OPERATIVE FACTS

12. Plaintiff is a professional educator. He taught high school mathematics in Baltimore, Maryland, for 29 years. For the past 32 years, plaintiff has owned a driving school, the Perry Hall Driving School, located in Perry Hall, Maryland. Plaintiff has given driving lessons to hundreds of students, many from foreign nations who have immigrated to the United States.

13. In May 2005, plaintiff received a phone call from Todd Lewis, who said that his production company, One America Productions, Inc., was producing a "documentary about the integration of foreign people into the American way of life." Being in the business of teaching foreign nationals to drive and understanding the importance of learning to drive, plaintiff was very interested in participating in the documentary.

14. Plaintiff spoke with Lewis by phone on several occasions after this initial phone call. They discussed plaintiff's background and his particular interest in educating foreign nationals and assimilating them into an American way of life. Plaintiff met with Lewis at the Perry Hall Driving School on Thursday, June 9, 2005. During their meeting, Lewis videotaped plaintiff, explaining that he needed to show a sample of plaintiff's appearance to the other producers of the documentary. Plaintiff informed Lewis that he was available for the actual taping for the

3

documentary during the next few days, except Monday, June 13, which was not convenient for plaintiff, because he had to teach a class at 6:00 p.m.

15.  The next day, Friday, June 10, Lewis called plaintiff and said that Monday, June 13, was the only convenient day for his crew and that the taping had to be somewhere closer to Washington, D.C., where Lewis's crew was supposedly based. Plaintiff suggested Columbia, Maryland. Lewis agreed. Plaintiff arranged to meet Lewis and his crew at the Snowden Square Shopping Center on Monday, June 12, 2005, at 1:00 p.m. The taping was scheduled to end by 5:00 p.m. Plaintiff told Lewis that he had to leave by 5:00 p.m. in order to arrive in Perry Hall for his 6:00 p.m. class.

16.  On June 12, 2005, plaintiff arrived one hour early – at 12:00 pm – at the agreed-upon location in Columbia, Maryland. Plaintiff then proceeded to find an appropriate cul-de-sac in Long Reach Village, about a mile away, to use as the driver-education course for the taping. Lewis and the production crew arrived 90 minutes later than agreed, at 2:30 p.m. By that time, plaintiff was almost ready to leave.

17.  As soon as Lewis arrived, he got into plaintiff's car and gave plaintiff $500 in cash and a few pieces of paper with a pen. Lewis said that the papers were standard and needed by the producers for the documentary. Rushed for time, plaintiff took the cash and signed the papers where Lewis indicated without reading or even more than looking where to sign and put his information. Lewis had not told plaintiff that he would be presented with any papers to sign, so plaintiff did not have his reading glasses with him. Relying on his previous conversations with Lewis, plaintiff believed that the papers were materials usually associated with a bona fide documentary.

18.  One document given to plaintiff by Lewis was entitled "Standard Consent Agreement," which was virtually illegible, the clarity of the text having been severely degraded by

4

numerous prior reproductions. Even if plaintiff had been prepared in the position to read the so-called Consent, he would have needed considerable time to do so - time defendants made sure plaintiff did not have.

19. Neither Lewis nor anyone other member of the production crew provided plaintiff with a copy of the Consent. Plaintiff did not receive a copy of the Consent until a formal request was made through counsel over a year and one half later, after the Borat film was released and in the theaters.

20. Soon after plaintiff signed the papers, Lewis showed plaintiff the driver-education car that the film crew had brought. As requested by plaintiff, the car was properly equipped with the required dual brakes, sideview mirrors, and signs. The car also had cameras mounted inside to videotape the driver and student. A member of the production crew attached a microphone attached to his plaintiff's body, and plaintiff was told to follow a production van that would have its rear doors open and be equipped with cameras. Plaintiff was given no instructions other than to follow the van through the course.

21. Plaintiff led the crew to the driver-education "course," where at the very last minute, a white stretch limousine appeared and defendant, Sacha Baron Cohen, dressed as "Borat," got out and approached plaintiff. As plaintiff went over to meet his "student" and introduce himself, Borat did a "kissie huggie" routine and then tried to get into the back of the car. Once he was corrected to get into the front, he did a whole routine of messing up the seat belts. (The seat-belt routine did not appear in the Borat film but was broadcast on the YouTube internet site extensively.)

22. What followed can only be described as surreal. Once Borat got into the front seat, he attempted to engage the seatbelt on by wrapping it between his legs, and twisting it all different ways, and struggling like a child. Plaintiff offered to help, but Borat finally managed to buckle the belt even though it was still twisted. Plaintiff instructed Borat to drive with the seatbelt

5

as it was since the car had already started by then. Borat held the steering wheel in a strange position. Plaintiff instructed him to put both hands on the wheel. Borat made a comment about how using two hands made him look funny. Plaintiff said that he didn't care what it looked like and to hold the wheel the proper way. When Borat started driving, he was stabbing the brake and driving on the wrong side of the road with another car approaching. Plaintiff grabbed the wheel to bring it to the correct side. Plaintiff tried to explain the basic rules. Rather than take instruction, Borat started bashing Jews, stating, among other slurs, that they were cheap. Plaintiff said that he would not tolerate such remarks. Borat then started bashing women, stating, among other inanities, that they had small brains. Plaintiff again admonished Borat against such remarks. Borat rolled down the window and offered a female pedestrian $10 for "sexy time." Plaintiff used his power window controls to roll up Borat's window and told Borat that women in this country can choose with whom they want to have sex. Borat was incredulous. Then Borat saw an African American man and started to scream "Chocolate Man!!" Plaintiff told him Borat to stop this as well. The car was moving the entire time, and plaintiff was very concerned for the safety of everyone in the car's proximity. At different points, Borat turned completely around to look out the back of the window, made a screeching U turn, made a left turn across a busy road, drank "alcohol," discussed two men going into the woods and doing "banga banga," and also drove very fast on quiet residential streets with children on the sidewalk, requiring plaintiff to grab the wheel or use his emergency brakes. After the drive finally ended, plaintiff got out of the car and told Borat that he needed a lot of practice but not to call plaintiff; plaintiff would call him.

23.     When the taping ended at 5:00 pm, plaintiff knew that he would be late for the 6:00 p.m. class at his driving school, but he went up to a group of men he thought were the producers of the film and said, "Did you hear what he was saying in the car? Did you see what he was doing in the car?" Nobody responded. "You set me up, and what you set me up for I don't

know." Again, nobody responded, and it was clear to plaintiff that none of the members of the production crew would speak to him or listen to what he had to say. Without time to gain anyone's attention, plaintiff left to teach his 6:00 p.m. class.

24. Realizing that Lewis had lied to him, plaintiff tried to determine what exactly had been the intent of the filming. Plaintiff tried calling Lewis for the next few days, but Lewis never returned any of plaintiff's phone calls. Plaintiff finally gave up and forgot about the incident until the release of the Borat film.

25. Plaintiff's name and, image have been extensively used not only in the Borat film and but also for the advertising and promotion of the film. Plaintiff's name and image have been broadcast on many talk shows, such as *The Late Show with David Letterman* and *Late Night with Conan O'Brian*. Plaintiff's name and image have been shown in advertisements appearing on HBO and CNN and in videos posted on YouTube. Plaintiff's image has appeared in all movie trailers advertising the film, on DVD trailers, and in the DVD version of the film.

26. On information and belief, the Borat film has grossed over $270 million in gross ticket sales to date.

27. On information and belief, the Borat film has grossed over $60 million in DVD sales.

## FIRST CLAIM
**Fraudulent Inducement - Compensatory and Punitive Damages**

28. All prior averments are repeated.

29. Lewis's representations to plaintiff regarding the purported documentary were false when made and known by Lewis to be false. The representations made by Lewis were made to induce plaintiff to appear in the Borat film, the true nature of which was never disclosed to plaintiff. Lewis deliberately deceived plaintiff about the purpose of the purported documentary and plaintiff's appearance in it.

30. Plaintiff reasonably relied on Lewis's representations by consenting to appear in the Borat film, which he had been led to believe was intended to be a legitimate documentary, and by signing the release.

31. Lewis and the other defendants knew that plaintiff would so rely.

32. Plaintiff did not know that the representations were false, and, prior to the filming of his segment of the Borat film, plaintiff could not with the exercise of due diligence have learned that the representations were false.

33. Had plaintiff known of the true facts, he would not have consented to appear in the Borat film and would not have signed the Standard Consent Agreement.

34. Plaintiff did not become aware of the true nature of the Borat film until the release of the film's trailer, in which plaintiff appeared.

35. Lewis's conduct constitutes fraudulent misrepresentation by virtue of his knowingly misrepresenting and concealing material facts with the intent that plaintiff rely on the false representations.

36. The other defendants actively participated in Lewis's fraud.

37. As a direct and foreseeable result of their fraudulent conduct, defendants

obtained a benefit that plaintiff would not have given but for the fraud – the value of plaintiff's appearance in the Borat film – and defendants have profited substantially from their fraud.

38. As a foreseeable victim of the fraud, plaintiff is entitled to recover from defendants, jointly and severally, both compensatory damages in an amount not less than $100,00 and punitive damages to be determined at trial.

## SECOND CLAIM
### Fraudulent Inducement - Rescission of the Release

39. All prior averments are repeated.

40. By virtue of defendants' fraudulent conduct, plaintiff is entitled to rescission of the Standard Consent Agreement.

## THIRD CLAIM
### Damages Pursuant to the New York Civil Rights Law

41. All prior averments are repeated.

42. Defendant used plaintiff's likeness in the Borat film without his consent for the purposes of trade in violation of the New York Civil Rights Law.

43. As a proximate and foreseeable result of defendant's illegal conduct, plaintiff has suffered and continues to suffer emotional damages.

44. As a result of their illegal conduct, defendants have profited greatly and unjustly.

45. Defendants are liable to plaintiff for compensatory damages in an amount not less than $100,000 and punitive damages in an amount to be determined at trial.

## FOURTH CLAIM
### Quantum Meruit

46. All prior averments are repeated.

47. By misappropriating plaintiff's likeness without his consent, defendants obtained a benefit, at plaintiff's expense that, in equity and good conscience, they should not have obtained.

48. Defendants have been unjustly enriched as a result of their fraudulent conduct.

49. Plaintiff does not have an adequate remedy at law.

50. Equity warrants that plaintiff receive substantial compensation from defendants for the use of his likeness in the Borat film and in the advertisement for the Borat film.

## FIFTH CLAIM
### Prima Facie Tort

51. All prior averments are repeated.

52. Defendants' conduct constitutes prima facie tort.

WHEREFORE, plaintiff demands judgment against defendants as follows:

A. *on the First Claim*, compensatory damages in the amount not less than $100,000, with interest thereon, plus punitive damages to be determined at trial;

B. *on the Second Claim*, declaring the Standard Consent Agreement rescinded and null and void;

C. *on the Third Claim*, compensatory damages in the amount not less than $100,000, with interest thereon, plus punitive damages to be determined at trial;

D. *on the Fourth Claim*, compensatory damages in the amount not less than $100,000, with interest thereon, plus punitive damages to be determined at trial;

E.   *on the Fifth Claim*, compensatory damages in the amount not less than $100,000, with interest thereon, plus punitive damages to be determined at trial;

F.   *on each Claim*, awarding to plaintiff his costs and disbursements of this action, including reasonable counsel fees, and granting to plaintiff such other, further, and different relief the court deems just and proper.

## JURY DEMAND

PLEASE TAKE NOTICE that plaintiff demands a trial by jury on all issues.

Dated: New York, New York
November 30, 2007

_____
PETER M. LEVINE (PML-7630)
488 Madison Avenue, 19th Floor
New York, New York 10022
212-599-0009

D. KRAUSZ AND ASSOCIATES

By: _____
Diane Krausz (DK-6967)
322 Eighth Avenue, Suite 601
New York, New York 10001
212-244-5292

ATTORNEYS FOR PLAINTIFF