UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK _ _ _ _ _

MICHAEL PSENICSKA,

Case No.: 07 CIV 10972 (LAP)

Plaintiff,

-against-

TWENTIETH CENTURY FOX FILM
CORPORATION, ONE AMERICA
PRODUCTIONS, INC., TODD LEWIS, and
SACHA BARON COHEN,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**

PETER M. LEVINE
488 Madison Avenue, 19th Floor
New York, New York 10022
(212) 599-0009

Diane F. Krausz, Esq.
D. Krausz and Associates
322 8th Avenue – Suite 601
New York, New York 10001
(212) 244-5292

**ATTORNEYS FOR PLAINTIFF**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-vi

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.    EVEN IF ENFORCEABLE, THE CONSENT AGREEMENT DOES NOT
      COVER A WORK OF FICTION SUCH AS THE BORAT FILM . . . . . . . . . . . 4

II.   DEFENDANTS CAN DO NO BETTER THAN SHOW THAT THE PHRASE
      "DOCUMENTARY-STYLE FILM" IS AMBIGUOUS . . . . . . . . . . . . . . . . . . . 10

III.  PSENICSKA MAY MAINTAIN A CLAIM FOR FRAUDULENT
      INDUCEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.   PSENICSKA DID NOT DISCLAIM RELIANCE ON THE ORAL
      MISREPRESENTATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V.    PSENICSKA MAY MAINTAIN A CLAIM FOR QUANTUM MERIT . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## CASES

*2 Broadway LLC v. Credit Suisse First Boston Mortg. Capital, LLC,*
    2001 WL. 410074 (S.D.N.Y.) ................................................................ 11

*Apfel v. Prestia,*
    41 A.D.3d 520, 838 N.Y.S.2d 605 (2d Dep't 2007) .................................... 1

*Bank of America Nat. Trust & Sav. Ass'n v. Gillaizeau,*
    766 F.2d 709 (2d Cir. 1985) .................................................................. 1

*Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank,*
    57 F.3d 146 (2d Cir.1995) .................................................................... 12

*Bauersfeld v. Board of Educ. of Morrisville-Eaton Cent. School Dist.,*
    46 A.D.3d 1003, 846 N.Y.S.2d 809 (3d Dep't 2007) ................................ 5

*Blog v. Sports Car Club of America, Inc.,*
    254 A.D.2d 65, 678 N.Y.S.2d 609 (1st Dep't 1998) ................................ 8

*Bloss v. Va'ad Harabonim of Riverdale,*
    203 A.D.2d 36, 610 N.Y.S.2d 197 (1st Dep't 1994) ................................ 14

*Brass v. American Film Technologies, Inc.*
    987 F.2D 142 (2d Cir. 1993) ................................................................ 13

*Breed v. Ins. Co. of North America,*
    46 N.Y.2d 351, 413 N.Y.S.2d 352 (1978) .............................................. 11

*Cahill v. Regan,*
    5 N.Y.2d 292, 184 N.Y.S.2d 348 (1959) ................................................ 5

*Capital Heat, Inc. v. Buchheit,*
    46 A.D.3d 1419, 848 N.Y.S.2d 481 (4th Dep't 2007) .............................. 18

*Cersani v. Sony Corp.,*
    991 F. Supp. 343 (S.D.N.Y. 1998) ........................................................ 20

*Citibank, N.A. v. Plapinger,*
    66 N.Y.2d 90, 495 N.Y.S.2d 309 (1985) ............................................ 16-17

*Connell v. Signoracci,*
    153 F.3d 74 (2d Cir.1998) (on Rule 12(b)(6) ........................................ 18

*Demaria v. Brenhouse,*
    277 A.D.2d 344, 716 N.Y.S.2d 99 (2d Dep't 2000) ................................ 5

*Dickson v. City of New York,*
  43 A.D.3d 809, 842 N.Y.S.2d 27 (1st Dep't 2007) ................................................... 12

*Farber v. Breslin,*
  47 A.D.3d 873, 850 N.Y.S.2d 604 (2d Dep't 2008) .................................................. 12

*Finger v. Omni Publications Intern., Ltd.,*
  77 N.Y.2d 138, 564 N.Y.S.2d 1014 (1990) ....................................................... 19, 20

*Fitzgerald v. Fahnestock & Co.,*
  850 N.Y.S.2d 452 (1st Dep't 2008) ............................................................................ 7

*Fleming v. Ponziani,*
  24 N.Y.2d 105, 299 N.Y.S.2d 134 (1969) ............................................................... 12

*Fonseca v. Columbia Gas Systems, Inc.,*
  37 F. Supp. 2d 214 (W.D.N.Y. 1998) ...................................................................... 18

*Freihofer v. Hearst Corp.,*
  65 N.Y.2d 135, 490 N.Y.S.2d 735 (1985) ........................................................... 2, 20

*GTE Automatic Electric Inc. v. Martin's Inc.,*
  127 A.D.2d 545, 512 N.Y.S.2d 107 (1st Dep't 1987) .............................................. 17

*Global Minerals and Metals Corp. v. Holme,*
  35 A.D.3d 93, 824 N.Y.S.2d 210 (1st Dep't 2006) ................................................. 12

*Goldman v. Belden,*
  754 F.2d 1059 (2d Cir.1985) ..................................................................................... 3

*Goodridge v. Fernandez,*
  121 A.D.2d 942, 505 N.Y.S.2d 144 (1st Dep't 1986) .............................................. 18

*Greenfield v. Philles Records, Inc.,*
  23 A.D.3d 214, 803 N.Y.S.2d 548 (1st Dep't 2005) ................................................ 10

*Gross v. Sweet,*
  49 N.Y.2d 102, 424 N.Y.S.2d 365 (1979) ................................................................. 9

*Guardian Life Ins. Co. of America, Inc. v. Schaefer,*
  70 N.Y.2d 888, 524 N.Y.S.2d 377 (1987) ............................................................... 10

*Hampton v. Guare,*
  195 A.D.2d 366, 600 N.Y.S.2d 57 (1st Dep't 1993) ................................................ 20

*Howell v. New York Post Co.,*
  81 N.Y.2d 115, 596 N.Y.S.2d 350 (1993) ............................................................... 19

*Innophos, Inc. v. Rhodia, S.A.,*
    38 A.D.3d 368, 832 N.Y.S.2d 197 (1st Dep't 2007) .................................................. 5

*JPMorgan Chase Bank v. Liberty Mutual Ins. Co.,*
    189 F. Supp. 2d 24 (S.D.N.Y. 2002) ................................................... 16, 17

*Jackson v. Broadcast Music, Inc.,*
    2006 WL. 250524 (S.D.N.Y.) ................................................................ 14

*Joint Venture Asset Acquisition v. Zellner,*
    808 F. Supp. 289 (S.D.N.Y. 1992) .......................................................... 2

*Kaminsky v. Gamache,*
    298 A.D.2d 361, 751 N.Y.S.2d 254 (2d Dep't 2002) .................................................. 7

*Kittay v. Kornstein,*
    230 F.3d 531 (2d Cir. 2000) ................................................................ 3, 18

*Krumme v. WestPoint Stevens, Inc.,*
    238 F.3d 133 (2d Cir. 2000) ................................................................ 10

*Lanni v. Smith,*
    89 A.D.2d 782, 453 N.Y.S.2d 497 (4th Dep't 1982) .................................................. 8

*Lifson v. INA Life Ins. Co. of New York,*
    333 F.3d 349 (2d Cir. 2003) ................................................................ 10

*Mangini v. McClurg,*
    24 N.Y.2d 556, 301 N.Y.S.2d 508 (1969) ................................................... 12

*Manufacturers Hanover Trust Co. v. Yanakas,*
    7 F.3d 310 (2d Cir. 1993) ...................................................... 2, 15, 16, 17

*Messenger v. Gruner Jahr Printing & Publishing,*
    94 N.Y.2d 436, 706 N.Y.S.2d 52 (2000) ................................................... 19

*Morales v. Solomon Management Co.,*
    38 A.D.3d 381, 832 N.Y.S.2d 195 (1st Dep't 2007) .................................................. 7

*Morby v. DiSiena Associates LPA,*
    291 A.D.2d 604, 737 N.Y.S.2d 678 (3d Dep't 2002) .................................................. 15

*Myskina v. Conde Nast Publications, Inc.,*
    386 F. Supp. 2d 409 (S.D.N.Y. 2005) ..................................................... 8

*NAB Const. Corp. v. City of New York,*
    276 A.D.2d 388, 714 N.Y.S.2d 279 (1st Dep't 2000) ................................................. 11

*Nowak v. Ironworkers Local 6 Pension Fund,*
    81 F.3d 1182 (2d Cir.1996) ................................................ 10

*Nussenzweig v. DiCorcia,*
    11 Misc.3d 1051( 814 N.Y.S.2d 891 (Sup. Ct. N.Y. Co. 2006) ................................ 20

*O'Hearn v. Bodyonics, Ltd.,*
    22 F. Supp. 2d 7 (E.D.N.Y. 1998) ........................................................... 15

*Pete's Corner, Inc. v. E-Miljud, Inc.,*
    84 A.D.2d 761, 443 N.Y.S.2d 772 (2d Dep't 1981) ..................................... 2

*Ruffino v. Neiman,*
    17 A.D.3d 998, 794 N.Y.S.2d 228 (4th Dep't 2005) ............................... 8, 20

*Sayers v. Rochester Tel. Corp.,*
    7 F.3d 1091 (2d Cir.1993) ................................................ 10

*Scala v. Sequor Group Inc.,*
    1995 WL. 225625 (S.D.N.Y.) ................................................ 18

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974)) ................................................ 3

*Seiden Assoc. Inc. v. ANC Holdings, Inc.,*
    959 F.2d 425 (2d Cir.1992) ................................................ 10

*Simonton v. Runyon,*
    232 F.3d 33 (2d Cir. 2000) ................................................ 18

*Skluth v. United Merchants & Mfrs., Inc.,*
    163 A.D.2d 104, 559 N.Y.S.2d 280 (1st Dep't1990) ............................... 12

*Skylon Corp. v. Guildford Mills, Inc.,*
    864 F. Supp. 353 (S.D.N.Y. 1994) ........................................ 11

*Sofia v. Hughes,*
    162 A.D.2d 518, 556 N.Y.S.2d 717 (2d Dep't 1990) ............................... 15

*Soumayah v. Minnelli,*
    41 A.D.3d 390, 839 N.Y.S.2d 79 (1st Dep't 2007) ............................... 18

*Touloumis v. Chalet,*
    156 A.D.2d 230, 548 N.Y.S.2d 493 (1st Dep't 1989) ............................... 11

*Turkish v. Kasenetz,*
    27 F.3d 23 (2d Cir.1994) ................................................ 2

*Villager Pond, Inc. v. Town of Darien,*
    56 F.3d 375 (2d Cir.1995) ................................................................................. 3

*Vines v. Gen. Outdoor Adver. Co.,*
    171 F.2d 487 (2d Cir.1948) ............................................................................. 7

*Walk-In Medical Centers, Inc. v. Brewer Capital Corp.,*
    818 F.2d 260 (2d Cir. 1987) ......................................................................... 10

*Washington Capital Ventures, LLC v. Dynamicsoft,*
    373 F. Supp. 2d 360 (S.D.N.Y. 2005) ....................................................... 15

*Weil v. Johnson,*
    2002 WL. 31972157 (Sup. Ct. N.Y. Co.) ................................................... 8

*Zoll v. Ruder Finn, Inc.,*
    2004 WL. 42260 (S.D.N.Y.) ....................................................................... 20

## STATUTES

*N.Y. Civ. Rts. Law § 51* (McKinney's 2008) .................................................. 19

## DOCUMENTARIES

*The Civil War* (1990) .......................................................................................... 7

*Gimme Shelter* (1970) ......................................................................................... 6

*Grey Gardens* (1975) .......................................................................................... 7

*Harvest of Shame* (1960) .................................................................................... 6

*Jazz On a Summer's Day* (1960) ......................................................................... 6

*The Last Waltz* (1978) ........................................................................................ 6

*Let It Be* (1970) .................................................................................................. 6

*Salesman* (1968) ................................................................................................. 7

*The Sorrow and the Pity* (1972) ......................................................................... 6

*Super Size Me* (2004) .......................................................................................... 5

*The Thin Blue Line* (1988) .................................................................................. 6

*Woodstock* (1970) ............................................................................................... 6

## MISCELLANEOUS

*New Oxford American Dictionary*
(Erin McLean, ed., 2d ed., New York: Oxford University Press, Inc. 2005) .......... 4, 5

## PRELIMINARY STATEMENT

The court need answer only one question on this motion: What does the phrase "documentary-style film" mean? Defendants ascribe a broad, but mendacious, meaning to the phrase, contending it encompasses a work of such obvious fiction as *Borat – Cultural Learnings of America for Make Benefit Glorious Nation Kazakhstan*. Plaintiff, Michael Psenicska, ascribes a more narrow, but ingenuous, meaning, contending the phrase encompasses only works of non-fiction presented in a documentary format, what any reasonable person would understand, what any dictionary will confirm. Defendants' *ipse dixit* does not answer the question, and their self-serving and implausible interpretation cannot allow them to use the Consent Agreement as a shield to insulate them from liability for their deceit and their unjust enrichment as Psenicska's expense.

Defendants' motion can be denied for several reasons:

▸ Limited to a "documentary-style film," the Consent Agreement pertains only to a work presenting political, social, or historical subject matter without the insertion of fictional material, and by its very terms does not extend to contrived works of fiction. *See Apfel v. Prestia*, 41 A.D.3d 520, 521, 838 N.Y.S.2d 605, 606 (2d Dep't 2007) (stipulation discontinuing the defendants' housing court proceeding and settling all claims "between the parties to date" not intended to preclude the plaintiff's personal injury action, which was pending at the time).

▸ At most, the phrase "documentary-style film" is ambiguous, and a dismissal pursuant to Rule 12(b) cannot be predicated on an ambiguous document. *See Bank of America Nat. Trust & Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 713 (2d Cir. 1985) (A release will not be given effect unless it contains an "explicit, unequivocal statement of a present promise to release [a party] from liability").

▸ Psenicska has properly pleaded the elements of fraudulent concealment, and on that basis may seek to avoid any release contained in the Consent Agreement: (1) defendants

misrepresented or concealed material facts about the Borat film; (2) the misrepresentations were false and known to be false when made, or the concealment was intentional; (3) the misrepresentations were made, or the concealment was done, with the intent of inducing reliance; (4) without the means to ascertain the truth, Psenicska reasonably relied on the misrepresentations. *See Joint Venture Asset Acquisition v. Zellner*, 808 F.Supp. 289, 302 (S.D.N.Y. 1992).

▸       The Consent Agreement contains neither a specific disclaimer of its own validity nor a specific disclaimer about a fictional work, and therefore does not preclude Psenicska from maintaining a fraud claim. *See Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 317 (2d Cir. 1993) (general merger clause in guarantee ineffective to preclude parol evidence of fraudulent inducement when the "Guarantee contains no disclaimer as to the validity, regularity, or enforceability of the Guarantee itself"); *Pete's Corner, Inc. v. E-Miljud, Inc.,* 84 A.D.2d 761, 443 N.Y.S.2d 772 (2d Dep't 1981) (contractual provision specifying that buyer takes items "as is" does not bar action for fraudulent misrepresentation when alleged misrepresentation concerns *value* rather than quality or quantity).

▸       Defendants' representations to Psenicska about the documentary for which they recruited him were consistent with the terms of the Consent Agreement, so even if Psenicska had read the Consent Agreement, he could not have discerned the true nature of the film defendants intended to produce. *See Turkish v. Kasenetz,* 27 F.3d 23, 27-28 (2d Cir.1994) (rule prohibiting party from claiming reliance on oral representation in face of specific disclaimer does not apply when party claims reliance "on written representations in the contract itself").

▸       The Civil Rights Law nowhere provides that someone can be tricked into providing his services for next to nothing. The Civil Rights Law does no more than create a limited scope of protection for the right of privacy, and only to the extent of affording a remedy for

commercial exploitation of an individual's name, portrait, or picture without written consent. *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 140, 490 N.Y.S.2d 735, 739 (1985). The statute has never been construed to prevent a claim of quantum meruit for rendering the sort of services defendants obtained from Psenicska.

Defendants have not come close to establishing beyond doubt that Psenicska cannot, under any circumstances, prove his claims of fraudulent inducement, violation of the New York Civil Rights Law, and quantum meruit. *See Kittay v. Kornstein*, 230 F.3d 531, 537 (2d Cir. 2000) (Rule 12(b)(6) motion may be granted only when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim); *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (issue before the court on Rule 12(b)(6) motion "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims") (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)), *cert. denied*, 519 U.S. 808 (1996); *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985) (on Rule 12(b)(6) motion, court does not weigh the evidence that might be presented at a trial; instead, court merely determines whether the claims are legally sufficient).

**ARGUMENT**

## I.    EVEN IF ENFORCEABLE, THE CONSENT AGREEMENT DOES NOT COVER A WORK OF FICTION SUCH AS THE BORAT FILM

Defendant Todd Lewis Shulman[1] told Psenicska that his production company, One America Productions, Inc., was producing a "documentary about the integration of foreign people into the American way of life." *Complaint ¶ 13*.

The cover letter for the Consent Agreement was consistent with Shulman's description: "Thanks very much for your interest in appearing in our Film. We're glad that you want to appear in the Film to share your views or insights with the public." (The letter did not define word "Film.") *Hansen Decl., Ex. A*. The reasonable inference to be drawn from these simple words is that Psenicska will be interviewed for the purpose of expressing a point of view on a specific subject or relating an experience – not for the purpose of being a straight man in a comedy routine.

The Consent Agreement itself (at ¶ 1) was also consistent with Shulman's description: "The Participant agrees to be filmed and audiotaped by the Producer for a documentary-style film (the "Film")." *Hansen Decl., Ex. A*. These words do not even hint at the true nature of the Borat film, and defendants cannot conjure new meanings for them. The word "documentary," as an adjective, means "(of a movie, a television or radio program, or photography) using pictures or interview with people involved in real events to provide a factual record or report: *he has directed documentary shorts and feature films*; as a noun, the word means "a movie or a television or radio program that provides a factual record or report." *New Oxford American Dictionary* (Erin McLean, ed., 2d ed., New York: Oxford University Press, Inc. 2005). The word "–style," as a suffix forming adjectives

---

[1]     The Complaint does not mistakenly name this defendant as "Todd Lewis." That was the name Shulman gave to Psenicska, and that was the name Shulman appeared to use when he signed the Consent Agreement, though some may discern the signature as illegible. *Hansen Decl., Ex. A*.

and adverbs, means: "in a manner characteristic of: *family-style | church style.*" *Id.* Therefore, the phrase "documentary-style film" means a work displaying the characteristics of a film that provides a factual record or report, and the Borat film is not such a work. A documentary chronicles actual people in actual events and by definition cannot be a work of fiction. A film made in the style of a documentary is based on facts that can be documented by reliable sources, and such a film does not contain fictional characters engaging in deliberately outre behavior to comedic effect. This obvious conclusion may be derived from the application of settled canons of construction. *See Bauersfeld v. Board of Educ. of Morrisville-Eaton Cent. School Dist.*, 46 A.D.3d 1003, 1005, 846 N.Y.S.2d 809, 811 (3d Dep't 2007) (court "duty-bound" to "give words and phrases employed their plain meaning"); *Innophos, Inc. v. Rhodia, S.A.*, 38 A.D.3d 368, 374, 832 N.Y.S.2d 197, 203 (1st Dep't 2007) (words in a written contract "should not be unnaturally forced beyond their ordinary meaning"), *aff'd*, 10 N.Y.3d 25 (2008).

Applying only to a "documentary-style film" and making no reference to a work of fiction, the Consent Agreement by its terms does not apply to the Borat film.[2] *See Cahill v. Regan,* 5 N.Y.2d 292, 184 N.Y.S.2d 348 (1959) (a release may not be read to cover matters which the parties did not intend to cover); *Demaria v. Brenhouse,* 277 A.D.2d 344, 345, 716 N.Y.S.2d 99, 100 (2d Dep't 2000) (same).

Defendants' expression of "hope[] to reach a young adult audience by using entertaining content and features" does not lead to a contrary conclusion or even create a contrary impression. First of all, the phrase "entertaining content" is not a term of art and is not necessarily

---

[2]    Defendants cannot be heard to say that the Borat film may be deemed a species of documentary. A true documentary is rarely a signatory to an agreement with the Screen Actors Guild, because actors do not appear in documentaries unless there are re-enactments of actual events. Containing no such re-enactments, the Borat film presented fictitious characters portrayed by paid professional actors who were SAG members.

understood to be limited to comedy or puerile satire. Many movie viewers, even young adults, would find a serious treatment of a topical issue to be entertaining. *See, e.g., Super Size Me* (2004, directed by Morgan Spurlock) (a demonstration of the physical and mental effects of consuming fast food and an examination of the food culture in America). Secondly, it's easy to list *bona fide* documentaries that a young adult audience would likely find entertaining: *Gimme Shelter* (1970, directed by Albert and David Maysles) (chronicle of Rolling Stones' 1969 tour, with much of the focus on the tragic concert at Altamont, California); *Let It Be* (1970, directed by Michael Lindsay-Hogg) (the recording of the Beatles' final album culminating in a performance by the band on the roof of Apple Records in London); *Woodstock* (1970, directed by Michael Wadleigh) (chronicle of legendary 1969 music festival); *The Last Waltz* (1978, directed by Martin Scorsese) (final concert of The Band); *Jazz On a Summer's Day* (1960, directed by Aram Avakian and Bert Stein) (1958 Newport Jazz Festival).

The phrase "documentary-style film" gave defendants the flexibility to produce a documentary in the style of any one of a number of sub-genres without having to answer to Psenicska about the method they chose to cover the topic of assimilating the foreign born into the American way of life. They could have followed the classic style of presenting archival footage mixed with interviews, as director Marcel Ophüls did in *The Sorrow and the Pity* (1972) (collaboration of France's Vichy government with Nazi Germany from 1940 to 1944; archival footage mixed with interviews of collaborators, resistance fighters, and observers).They could have varied the classic style by including dramatic re-enactments of actual events based on forensic evidence, as director Errol Morris did in *The Thin Blue Line* (1988) (arguing that a man was wrongly convicted for murder by a corrupt justice system in Dallas, this documentary combined dramatic re-enactments of the crime and the investigation with contemporaneous newspaper accounts and photographs of the case and with interviews of the suspects, defense counsel, and trial witnesses). They could have presented

-6-

their film in a news format in the style of CBS Reports, *e.g.*, *Harvest of Shame* (1960, directed by Fred W. Friendly) (in this production broadcast on Thanksgiving, 1960, Edward R. Murrow reported on the plight of migrant farm workers in America). They could have followed the style of cinema verite, as directors Albert and David Maysles did in *Salesman* (1968) (Four relentless door-to-door salesmen deal with constant rejection, homesickness and burnout as they go across the country selling very expensive bibles to low-income Catholic families) and *Grey Gardens* (1975) (the bizarre and reclusive lives of Edith Bouvier Beale and her daughter Edie among cats and raccoons in a crumbling mansion in East Hampton). They could have included in their documentary-style film slow pans across sepia-toned photographs while professional actors read from news accounts, letters, or diaries – a technique used to interesting effect by Ken Burns in *The Civil War* documentary (1990).

At most, what defendants tout as a general release in the Consent Agreement, even if valid, pertains only to claims in relation to a "documentary-style film," not a work of fiction like the Borat film. The so-called release in Paragraph 4 – by which Psenicska purported to waive "any claims against the Producer ... or anyone associated with the Film" – is limited by the definition of the "Film" in Paragraph 1. *See Morales v. Solomon Management Co.*, 38 A.D.3d 381, 382, 832 N.Y.S.2d 195, 196-97 (1st Dep't 2007) (when "a release contains a recital of a particular claim, obligation or controversy and there is nothing on the face of the instrument other than general words of release to show that anything more than the matters particularly specified was intended to be discharged, the general words of release are deemed to be limited thereby") (citations omitted); *Kaminsky v. Gamache*, 298 A.D.2d 361, 361-362, 751 N.Y.S.2d 254, 256 (2d Dep't 2002) ("if from the recitals therein or otherwise, it appears that the release is to be limited to only particular claims, demands or obligations, the instrument will be operative as to those matters alone"); *Vines v. Gen.*

*Outdoor Adver. Co.,* 171 F.2d 487, 492 (2d Cir.1948) (Hand, J.) ("[I]n a release[,] words of general import, followed or preceded by words relating to specific claims, are, ceteris paribus, limited to the specific claims").

Because Psenicska did not give his consent for the use of his image or the exploitation of his services in a work of fiction, he may pursue his claims in this action. *See Fitzgerald v. Fahnestock & Co.,* 850 N.Y.S.2d 452, 453-54 (1st Dep't 2008) ("the settlement agreement and release between petitioner and Fahnestock, which contained a recital of petitioner's action against Fahnestock and their desire to settle the action, but no reference to petitioner's employment or his employment agreement, is not necessarily a general release"); *Blog v. Sports Car Club of America, Inc.,* 254 A.D.2d 65, 66, 678 N.Y.S.2d 609, 610 (1st Dep't 1998) (release of negligence claims arising out of go-kart race does not cover claims involving the design, manufacture, or sale of the go-kart); *Lanni v. Smith,* 89 A.D.2d 782, 783, 453 N.Y.S.2d 497, 498 (4th Dep't 1982) (release referring to specific claims does not cover all claims arising from same accident, because "There is no phrase indicating that the release covers all claims arising from the accident").

The cases cited by defendants in which a claim for commercial misappropriation was explicitly covered by a release are, perforce, inapposite. *See Myskina v. Conde Nast Publications, Inc.,* 386 F.Supp.2d 409, 416 (S.D.N.Y. 2005) ("The purported oral agreement contradicts the plain language of the Release"); *Ruffino v. Neiman,* 17 A.D.3d 998, 1000, 794 N.Y.S.2d 228, 229 (4th Dep't 2005) ("the alleged misrepresentations ... directly conflict with the terms of the written consent"); *Weil v. Johnson,* 2002 WL 31972157 (Sup. Ct. N.Y. Co.) (three "clearly worded" releases preclude claim under section 51 of the New York Civil Rights Law when the plaintiff's "allegations are contradicted by the very face of the Release"). *Weil* is also distinguishable on another ground: The film in which the plaintiff appeared was exactly what had been orally described to him by the

producers – a documentary about the lives of children who had grown up very wealthy. Here, what both Todd Lewis Shulman and the Consent Agreement said about the documentary-style film and what was actually produced were two very different species of motion picture.

Defendants' strained interpretation of the Consent Agreement shows that they tried to write it to obfuscate, not elucidate – a point confirmed by Todd Lewis Schulman's signing a phony name. Defendants could have told Psenicska that he was being asked to appear in a motion picture portraying a fictional account of a staged journey across America by a fictional character whose *raison d'etre* was to provoke base reactions from the unwitting. Of course, had they been forthright, defendants would have risked Psenicska's refusal to participate or risked the loss of spontaneity. Rather than face such risks, defendants chose to mask their intentions with outright lies and sleazy business practices. That choice, however, does not come without a consequence: Defendants cannot now impose their hidden intent on Psenicska. *See Gross v. Sweet*, 49 N.Y.2d 102, 110, 424 N.Y.S.2d 365, 369-70 (1979) ("In short, instead of specifying to prospective students that they would have to abide any consequences attributable to the instructor's own carelessness, the defendant seems to have preferred the use of opaque terminology rather than suffer the possibility of lower enrollment. But, while ... the law grudgingly accepts the proposition that men may contract away their liability for negligently caused injuries, they may do so only on the condition that their intention be expressed clearly and in unequivocal terms") (quotation omitted).

**II.     DEFENDANTS CAN DO NO BETTER THAN SHOW THAT THE PHRASE "DOCUMENTARY-STYLE FILM" IS AMBIGUOUS**

An ambiguous release may not form the basis for a motion to dismiss pursuant to Rule 12(b)(6). The relevant inquiry at this point of the proceedings is whether each party has advanced a reasonable interpretation of the scope of the Consent Agreement, rendering it ambiguous under ordinary principles of contract interpretation. *See Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1192 (2d Cir.1996) (in a contract dispute, summary judgment may be granted only when the language of the contract is unambiguous); *Walk-In Medical Centers, Inc. v. Brewer Capital Corp.*, 818 F.2d 260 (2d Cir. 1987) (motion for summary judgment properly denied because the term "adverse market conditions" was susceptible of at least two reasonable interpretations).

The language of a contract is ambiguous "if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Krumme v. WestPoint Stevens, Inc.,* 238 F.3d 133, 138-139 (2d Cir.2000). *Accord Sayers v. Rochester Tel. Corp.,* 7 F.3d 1091, 1095 (2d Cir.1993).

Any ambiguity in the Consent Agreement must be construed against defendants, both as the moving parties [*Seiden Assoc. Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 429 (2d Cir.1992) (on a motion for summary judgment, any ambiguity must be construed against the moving party)] and as the drafters of the Consent Agreement [*Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349, 353 (2d Cir. 2003) ("We construe ambiguities against the drafter"); *Guardian Life Ins. Co. of America, Inc. v. Schaefer,* 70 N.Y.2d 888, 890, 524 N.Y.S.2d 377, 378 (1987) (ambiguities in contracts must be construed against the drafter"); *Greenfield v. Philles Records, Inc.*, 23 A.D.3d 214, 214-215, 803 N.Y.S.2d 548, 549 (1st Dep't 2005) (trial court properly construed ambiguity against drafter)].

Contrary to defendants' assertions, it cannot be said, as a matter of law, that the

Consent Agreement on its face is so clear and unambiguous that Psenicska has no chance of presenting a prima facie case. *Cf. Breed v. Ins. Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355 (1978) (when relevant language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion," no ambiguity exists). Defendants cannot possibly argue in good faith that Psenicska's interpretation of the Consent Agreement is unreasonable. Hence, defendants must defend their ambiguous Consent Agreement at trial. *NAB Const. Corp. v. City of New York,* 276 A.D.2d 388, 389, 714 N.Y.S.2d 279, 280 (1st Dep't 2000) (when contract ambiguous, reference to parol evidence to discern the intentions of the parties is appropriate).

Defendants' cases on this point, each involving a clear and unambiguous release negotiated by the parties, cannot stand as persuasive authority here. *See 2 Broadway LLC v. Credit Suisse First Boston Mortg. Capital, LLC,* 2001 WL 410074 (S.D.N.Y.) (Def. Mem. 4) ("The release agreements at issue here are unambiguous. ... Moreover, the release agreements were executed at the close of arm's length negotiations by exceedingly sophisticated commercial actors"); *Skylon Corp. v. Guildford Mills, Inc.,* 864 F.Supp. 353, 358 (S.D.N.Y. 1994) (Presa, J.) (Def. Mem. 7) ("clearly written" release "signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel"); *Touloumis v. Chalet,* 156 A.D.2d 230, 548 N.Y.S.2d 493 (1st Dep't 1989) (Def. Mem. 7, 8, 9) ("Furthermore, there can be no mistaking the clear terms of the general release").

### III.    PSENICSKA MAY MAINTAIN A CLAIM FOR FRAUDULENT INDUCEMENT

A release may be set aside on the traditional bases of fraudulent inducement, fraudulent concealment, or misrepresentation. *Mangini v. McClurg*, 24 N.Y.2d 556, 566, 301 N.Y.S.2d 508, 517 (1969) ("Fraud, however, has long been a ground for setting aside a release"); *Dickson v. City of New York*, 43 A.D.3d 809, 842 N.Y.S.2d 27, 28 (1st Dep't 2007) (plaintiffs could seek rescission of release based on misrepresentation about amount of available insurance); *Skluth v. United Merchants & Mfrs., Inc.*, 163 A.D.2d 104, 106, 559 N.Y.S.2d 280, 282 (1st Dep't 1990) ("A release may, of course, be attacked for being the product of fraud, duress or undue influence").

In order to set aside a release on such grounds, a plaintiff must establish the basic elements of fraud: a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury. *Global Minerals and Metals Corp. v. Holme*, 35 A.D.3d 93, 98, 824 N.Y.S.2d 210, 214 (1st Dep't 2006). Each of those elements is properly pleaded in the Complaint (at ¶¶ 12-24), and Psenicska's factual allegations of fraud in the procurement of the Consent Agreement are sufficient to defeat defendants' Rule 12(b)(6) motion. *See Farber v. Breslin*, 47 A.D.3d 873, 850 N.Y.S.2d 604, 608 (2d Dep't 2008) ("Here, the allegations of fraud were sufficient to support a possible finding that the release signed by the plaintiff was obtained under circumstances which indicate unfairness").

Defendants have the burden of proving by the preponderance of the evidence that the release was valid at its inception. *Fleming v. Ponziani*, 24 N.Y.2d 105, 112-13, 299 N.Y.S.2d 134, 141 (1969). At this stage of the proceedings, defendants cannot meet that burden.

If a party has a duty to disclose, that party's failure to disclose a material fact may be as actionable as an affirmative misrepresentation made by the party. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995); *Farber v.*

-12-

*Breslin* 850 N.Y.S.2d at 607 (allegations that, prior to sale of plaintiff's interest in limited partnership, defendant had failed to disclose the imminent settlement of a foreclosure action against realty owned by partnership stated causes of action for, *inter alia*, failure to disclose material information and fraudulent concealment).

In *Brass v. American Film Technologies, Inc.*, the Second Circuit listed three circumstances in which a duty to disclose may arise under New York law: "first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party, it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." 987 F.2d 142, 150 (2d Cir.1993) (quotations and citations omitted).

The first circumstance is present here. Defendants engaged in the classic bait and switch. They told Psenicska, orally and in writing, that they would be producing one kind of motion picture – a "documentary-style film"about assimilation into the American way of life – while concealing the fact that they were actually producing an entirely different kind of motion picture – a work of fiction mocking the idea of tolerance and understanding among diverse peoples.

The third circumstance is also present here. Not wise to the wiles of Hollywood players, Psenicska could not have ascertained the true nature of the Borat film, a matter within defendants' exclusive knowledge. He was not shown a script; he did not meet the director; he was not told there would be paid SAG actors, nor was he given any reason to suspect there would be any; he was mislead by the producer, who did not even give his real name. Everything appeared to be as represented until the cameras started rolling. Defendants made certain that Psenicska could not have access to all of the facts before they game him the Consent Agreement to sign. Knowing that Monday, June 13, 2005, was not convenient for Psenicska, Todd Lewis Shulman called Psenicska

-13-

on Friday, June 10, and said that the taping had to be on June 13, and at a location miles from his home. *Complaint ¶¶ 14-15*. On the day of the taping, defendants kept Psenicska waiting for more than 90 minutes, so long that he was about to leave – another tactic designed to disorient him. *Id. ¶ 16*. Having made sure Psenicska was rushed for time, Shulman had Psenicska sign the Consent Agreement, took it without leaving Psenicska with a copy, then got Psenicska involved in the "documentary-style film." *Id. ¶¶ 17-20*. Defendants continued to keep Psenicska ignorant of the true nature of the Borat film even after his ride with Sasha Baron Cohen. No one from the production crew would acknowledge his questions, and Shulman, on his way to the next victim, did not return Psenicska's post-taping phone calls. *Id. ¶¶ 23-24*. Defendants should not be permitted to profit from this behavior. *See Bloss v. Va'ad Harabonim of Riverdale*, 203 A.D.2d 36, 39-40, 610 N.Y.S.2d 197, 200 (1st Dep't 1994) ("it is inequitable to allow a release to bar a claim where, as here, it is alleged that the releasor had little time for investigation or deliberation and that it was the result of overreaching or unfair circumstances").

The fact that Psenicska did not read the Consent Agreement does not, standing alone, preclude him from maintaining a fraud claim. Such a fact might preclude him only if he were asserting that he believed the Consent Agreement contained a provision directly contradicted by its actual terms. Psenicska is not making such an assertion. He is instead asserting that the Consent Agreement is actually consistent with the oral representations about the Borat film. Had he read the Consent Agreement, he would have seen nothing within its four corners to disabuse him of what Todd Lewis Shulman had led him to believe about the film.

Defendants' cases on this point are easily distinguishable. *Def. Mem. 7-9*. Each of those cases presented allegations of misrepresentations that were directly contradicted by the explicit terms of a clear and unambiguous release. *See Jackson v. Broadcast Music, Inc.*, 2006 WL 250524 *9 (S.D.N.Y.)(when contracts "clearly and explicitly state that plaintiff was thereby conveying" his

rights in a song, he "could not reasonably have relied on any alleged misrepresentations to the contrary"); *Washington Capital Ventures, LLC v. Dynamicsoft*, 373 F.Supp.2d 360, 366 (S.D.N.Y. 2005) ("some representations ... were plainly contradicted by the meaning of the written document"); *Morby v. DiSiena Associates LPA*, 291 A.D.2d 604, 605-606, 737 N.Y.S.2d 678, 680 (3d Dep't 2002) (plaintiff's personal injury action precluded by "clear and unambiguous" release discharging "any and all claims for personal injury"); *Sofia v. Hughes*, 162 A.D.2d 518, 556 N.Y.S.2d 717 (2d Dep't 1990) (plaintiff's personal injury action precluded when "[t]he text of the release itself made clear beyond any possible doubt that the scope of the release extended to potential liability for damages for personal injuries, however serious").

## IV.    PSENICSKA DID NOT DISCLAIM RELIANCE ON THE ORAL MISREPRESENTATIONS

The Consent Agreement (at ¶ 5) contains a general and vague merger clause:

> This is the entire agreement between the Participant and the Producer or anyone else in relation to the Film, and the Participant acknowledges that in entering into it, the Participant is not relying upon any promises or statement made by anyone about the nature of the Film or the identity of any other Participants or person involved in the Film.

*Hansen Decl., Ex. A.* This clause puts no impediment in the way of Psenicska's claims.

A general merger clause is ineffective to preclude parol evidence that a party was induced to enter the contract by means of fraud. Even when the contract contains an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made, a party may avoid the contract by establishing that he was induced to enter the contract by fraud. *Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993); *O'Hearn v. Bodyonics, Ltd.*, 22 F.Supp.2d 7, 13 (E.D.N.Y. 1998) ("Parol evidence is admissible to prove fraud even if the disputed contract contains a standard merger clause stating that the signatories acknowledge the written document supersedes all prior agreements and constitutes the sole

embodiment of their obligations") (citations omitted).

Dismissal of the Psenicska's claim for rescission would be inappropriate at this early stage of the proceedings. The Consent Agreement does "not purport to waive defenses to its own validity"; nor does the Consent Agreement contain a "disclaimer as to the validity, regularity, or enforceability of the [Consent Agreement] itself." *Yanakas*, 7 F.3d at 317. Also, as in *Yanakas*, "There [is] no evidence that the scope or character of the [Consent Agreement] was the product of any negotiations between the parties." *Id.* Psenicska's acknowledgment that he was "not relying upon any promises or statement made by anyone about the nature of the Film" does not preclude his claim that those words – and the whole Consent Agreement itself – were procured by defendants' fraudulent concealment of material facts about the nature of the Borat film. *See MLP U.S.A., Inc. v. Motheral*, 2006 WL 2389348 at *2 (S.D.N.Y.) (guaranty's waiver of all defenses "which might constitute a legal or equitable discharge of a surety or guarantor" and agreement that guarantee "shall be valid and unconditionally binding upon Guarantor in any event and under all circumstances" does not "render immaterial the defense that those words – and the whole Guaranty itself – were procured by fraudulent concealment ...").

At most, Psenicska disclaimed reliance on representations relating only to a "documentary-style film," not a work of fiction. The disclaimer cannot be read to mean that defendants could produce a film different from what was described in the Consent Agreement. If so, then the misrepresentation of the transaction in the Consent Agreement itself renders the Consent Agreement unenforceable. *See JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*, 189 F.Supp.2d 24, 27 (S.D.N.Y. 2002) (notwithstanding broad disclaimer clause, surety bonds that misrepresent nature of transaction subject to "a defense of fraudulent inducement or concealment premised on fraudulent misrepresentations in the Bonds themselves").

Defendants trot out that venerable warhorse, *Citibank, N.A. v. Plapinger*, 66 N.Y.2d

90, 495 N.Y.S.2d 309 (1985), for the proposition that an absolute and unconditional guarantee precludes a claim of fraudulent inducement. *Def. Mem. 13*. Defendants' reliance on this case is misplaced. In *Plapinger*, the Court of Appeals held that corporate officers who had signed guarantees of corporate debt containing a broad disclaimer clause could not escape payment by arguing that they had been fraudulently induced to sign the guarantees in reliance on the lenders' unfulfilled oral promises to extend additional credit to the corporation. The disclaimer language had been negotiated as part of the same negotiations in which, the officers later claimed, they were orally promised an additional line of credit. Because the alleged oral promises were inconsistent with the specific disclaimer of reliance in the guarantee, the officers were precluded from asserting reliance on any oral promises made during their negotiations with the lenders. Contrary to defendants' assertion, *Plapinger* does *not* stand for the proposition that a general sweeping waiver can serve to waive any and all defenses regardless of circumstances, regardless of the expectations of the parties, or regardless of the objective circumstances under which the guarantee was delivered. Rather, as the Second Circuit stated in *Yanakas*, "the touchstone is specificity," a clear indication that the guarantor knowingly waived a specific defense. 7 F.3d at 316. *See JPMorgan Chase Bank v. Liberty Mutual Ins. Co.*, 189 F.Supp.2d at 27( a broad disclaimer clause was ineffective to bar a claim of fraudulent concealment, for lack of a "clear indication that the disclaiming party has knowingly disclaimed reliance on the specific representations that form the basis of the fraud claim").

   *Plapinger* cannot be applied here. The Consent Agreement does not contain a sufficiently specific disclaimer of Psenicska's claim of fraudulent inducement, and unlike the guarantors in *Plapinger*, Psenicska is not seeking to evade a disclaimer based upon facts he knew of, was on notice of, or could have readily ascertained. *See GTE Automatic Electric Inc. v. Martin's Inc.*, 127 A.D.2d 545, 546-47, 512 N.Y.S.2d 107, 108 (1st Dep't 1987) ("The promissory notes at issue here, however, do not contain a specific disclaimer, as in *Plapinger*; therefore, the principle

of that case does not apply"); *Goodridge v. Fernandez*, 121 A.D.2d 942, 945, 505 N.Y.S.2d 144, 147 (1st Dep't 1986) ("the guaranty here, in sharp contrast to the guaranty in *Plapinger,* contains no specific disclaimer of defenses available to the guarantor with respect to the guaranty").

Defendants' other two cases on this point – *Fonseca v. Columbia Gas Systems, Inc.*, 37 F.Supp.2d 214 (W.D.N.Y. 1998) and *Scala v. Sequor Group Inc.*, 1995 WL 225625 (S.D.N.Y.) – are distinguishable, because the disclaimer was sufficiently specific to match the alleged fraud.

## V.    PSENICSKA MAY MAINTAIN A CLAIM FOR QUANTUM MERIT

Psenicska has adequately pleaded a claim for quantum meruit: he performed services in good faith for defendants (*Complaint ¶¶ 21-22*); defendants accepted those services (*id. ¶ 25*); he expected compensation therefor (*id. ¶ 12*); and he has specified the reasonable value of the services (*id. ¶¶ 38, 45*). *See Capital Heat, Inc. v. Buchheit*, 46 A.D.3d 1419, 1420-1421, 848 N.Y.S.2d 481, 483 (4th Dep't 2007); *Soumayah v. Minnelli*, 41 A.D.3d 390, 391, 839 N.Y.S.2d 79, 81 (1st Dep't 2007).

Granted, the Complaint could have presented this claim more clearly. Nonetheless, Psenicska may still proceed, because the facts supporting the claim must be accepted as true, and he must be accorded the benefit of every favorable inference to be drawn from those facts. *See Kittay v. Kornstein*, 230 F.3d 531, 537 (2d Cir. 2000) (a complaint need only allege facts that, if true, would create a judicially cognizable cause of action); *Connell v. Signoracci*, 153 F.3d 74 (2d Cir.1998) (on Rule 12(b)(6) motion, court must construe all reasonable inferences in favor of the plaintiff). A complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also plead the legal theory correctly. *Simonton v. Runyon*, 232 F.3d 33, 36-37 (2d Cir. 2000).

Psenicska provided a very valuable service to defendants. Defendants sought out Psenicska; he did not volunteer. They sought him out for good reasons – his skill as a driving instructor and his engaging temperment. They knew Sasha Baron Cohen would be driving recklessly,

often illegally, and would be posing a danger to other motorists and pedestrians, as well as to himself. They needed someone who would not only look the part of a competent driving instruction but also keep his cool during Cohen's wild driving. Psenicska protected the most valuable asset of the Borat film – Cohen. Had Cohen's antics led to an accident, the Borat film might not have been completed. Because Psenicska kept Cohen and the innocent people around him safe, the production of the Borat film could continue and eventually gross over $330 million. *Complaint ¶¶ 26-27*.

Section 51 of the New York Civil Rights Law does not preclude Psenicska from seeking the reasonable value of his services as a driving instructor. The statute does no more than provide a remedy for "[a]ny person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent." *N.Y. Civ. Rts. Law § 51* (McKinney's 2008). Defendants' exploitation of Psenicska's services does not fall within the statute's limited scope:

> The prohibitions of Civil Rights Law §§ 50 and 51 are to be strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person. These statutory provisions prohibit the use of pictures, names or portraits "for advertising purposes or for the purposes of trade" *only,* and nothing more. The statute was drafted narrowly to encompass only the commercial use of an individual's name or likeness and no more.

*Finger v. Omni Publications Intern., Ltd.*, 77 N.Y.2d 138, 141, 564 N.Y.S.2d 1014, 1016 (1990) (citations and quotations omitted). Defendants did not simply use Psenicska's image. They availed themselves of his services as an on-screen talent, and they must pay for them.

Not a single case cited by defendants involved the unpaid appropriation of services. *See Messenger v. Gruner Jahr Printing & Publishing*, 94 N.Y.2d 436, 706 N.Y.S.2d 52 (2000) (unauthorized publication of plaintiff's photograph in conjunction with sexual advice column in magazine); *Howell v. New York Post Co.*, 81 N.Y.2d 115, 596 N.Y.S.2d 350 (1993) (unauthorized publication of plaintiff's photograph in conjunction with newspaper article about an unrelated public

-19-

figure); *Finger v. Omni Publications Intern., Ltd.*, 77 N.Y.2d 138, 564 N.Y.S.2d 1014 (unauthorized publication of photograph of family in conjunction with magazine article about caffeine-aided fertilization); *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 490 N.Y.S.2d 735 (use of information taken from matrimonial court files for newspaper article about plaintiff's divorce); *Hampton v. Guare*, 195 A.D.2d 366, 600 N.Y.S.2d 57 (1st Dep't 1993) (use of information in the public record for play inspired by widely-reported criminal scam perpetrated by plaintiff); *Ruffino v. Neiman*, 17 A.D.3d 998, 794 N.Y.S.2d 228 (newspaper advertisement containing photographs taken of plaintiff before and after hair transplant surgery performed by dermatologist); *Nussenzweig v. DiCorcia*, 11 Misc.3d 1051(A), 814 N.Y.S.2d 891 (Sup. Ct. N.Y. Co. 2006) (public display in art gallery of photograph taken of plaintiff while he was walking in Times Square); *Zoll v. Ruder Finn, Inc.*, 2004 WL 42260 (S.D.N.Y.) (unauthorized broadcast of videotape displaying plaintiff's image); *Cersani v. Sony Corp.*, 991 F.Supp. 343 (S.D.N.Y. 1998) (depiction of mobster in film under fictitious name).

## CONCLUSION

Entitled at this stage of the proceedings to all reasonable inferences, Psenicska should be given the opportunity to hold defendants accountable for misleading him. Defendants' motion should be denied.

Dated: New York, New York
April 8, 2008

PETER M. LEVINE (PML-7630)
488 Madison Avenue, 19th Floor
New York, New York 10022
212-599-0009

D. KRAUSZ AND ASSOCIATES
322 Eighth Avenue, Suite 601
New York, New York 10001
212-244-5292

ATTORNEYS FOR PLAINTIFF

-20-

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK       )
                              ) ss.:

COUNTY OF NEW YORK     )

         PETER M. LEVINE, being duly sworn says:

         I am not a party to the action, am over 18 years of age and reside in Westchester

County, NY.

         On April 8, 2008, I served a true copy of the annexed

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

in the following manner:  by delivering same to an office of **FedEx** for next day delivery, addressed

to the last known addresses of the parties as indicated below:

                  Slade R. Metcalf, Esq.
                  Hogan & Hartson LLP
                  875 Third Avenue
                  New York, NY 10022

                                   PETER M. LEVINE

Sworn to this 8th day of
April 2008

NOTARY PUBLIC
DONNA M. GANT
Notary Public State of New York
No. 01GA6128605
Qualified in Queens County
My Commission Expires 06/13/2009